UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
NEW YORK DIVISION

| | | |
|---|---|---|
| KEVIN HE, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 1:26-cv-7016 |
| v. | § | |
| | § | COMPLAINT |
| TD SECURITIES, INC., | § | |
| | § | JURY DEMAND |
| *Defendant*. | § | |
| | § | |

Plaintiff Kevin He ("Plaintiff"), by his counsel, Harman Green, alleges for his Complaint against Defendant TD Securities, Inc. ("Defendant") as follows:

**PRELIMINARY STATEMENT**

1. This case involves the failure to provide an accommodation to Plaintiff for remote work.

2. Plaintiff sought a remote work accommodation so that he may relocate to a climate that would allow his disabilities to be better managed.

3. Plaintiff had been previously allowed remote work accommodations.

**JURISDICTION**

4. Pursuant to 28 U.S.C. §1331 this Court may properly hear Plaintiff's claims as they arise under a federal statute.

5. Pursuant to 28 U.S.C. §1332, this Court may properly hear Plaintiff's claims as the controversy arises under complete diversity of the parties and the amount in question exceeds $75,000.

6. Pursuant to 28 U.S.C. §1367 this Court may properly hear Plaintiff's State and local law claims as they arise out of the same nucleus of operative fact so as to create the same case or

controversy.

7. Plaintiff timely filed with the Equal Employment Opportunity Commission, Charge number 520-2025-07945, and received a Right to Sue letter on May 21, 2026. This case was filed within 90 days of receipt of that Right to Sue Letter.

## PARTIES

8. Plaintiff was a resident of Kings County, New York and now resides in Florida..

9. Defendant is a Canadian multinational investment bank headquartered in Toronto, Ontario, Canada, but maintains a corporate flagship store at 1 Vanderbilt Ave, New York, NY 10017.

## JURY DEMAND

10. Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

11. On or about June 4, 2018, Plaintiff began working for Defendant as a Trading Business Management Summer Analyst with an annual salary of $70,000.00.

12. Plaintiff's job duties and responsibilities included, but were not limited to, overseeing trading desks and creating performance reports.

13. Plaintiff was shifted across various roles until July 2021, where he was moved to the Trade Support Group with an approximate corresponding raise of $10,000.00.

14. Plaintiff's performance, up to and including his latest review in 2023, was consistently rated as positive.

15. Plaintiff's final average salary was about $95,000.00 after earning merit-based annual raises.

16. Plaintiff therefore was experienced, duly qualified, and surpassed the expectations for his position.

17. Furthermore, Plaintiff has no disciplinary actions on record with Defendant.

18. Plaintiff's direct supervisor was Marc Flaxman.

19. From January 2020 through approximately fall of that same year, Plaintiff was working remotely due to the health risks associated with the COVID-19 pandemic.

20. Plaintiff then worked in Defendant's place of business on 1 Vanderbilt Avenue, New York, NY until approximately April 2022.

21. Plaintiff suffers from Topical Steroid Withdrawal ("TSW"), a skin condition characterized by burning, intensely irritated skin with lesions, pustules, or drying and flaking across areas of the body that underwent prolonged corticosteroid or hydrocortisone cream usage.

22. In Plaintiff's case, TSW arose out of typical eczema treatments (this includes hydrocortisone, corticosteroids, elidel, and protopic) prescribed by his dermatologist to treat his severe eczema.

23. Plaintiff's TSW causes full-body inflammation, in addition to red, hardened, thinned and flaking skin.

24. Plaintiff's TSW also impairs his temperature regulation, as well as his limb functionality and mobility.

25. Mitigating the pain and heightened sensitivity during TSW flare-ups forces Plaintiff to sometimes disrobe entirely, which he mentioned to Defendant.

26. About March 2022, Plaintiff contacted Mr. Flaxman to discuss the nature of, and accommodations for, his TSW.

27. During this meeting, Plaintiff explained that he was undergoing a flare-up of symptoms and requested a reasonable remote work accommodation to manage his condition.

28. As proof, Plaintiff sent Mr. Flaxman accompanying photos of his skin post-flare-up.

29. Mr. Flaxman granted the reasonable remote work accommodation and Plaintiff started working remotely again.

30. Having secured manager approval, Plaintiff contacted HR shortly thereafter to provide a medical note from treating dermatologist alongside necessary documentation in support of his accommodation request.

31. Around Spring 2022, Plaintiff requested a permanent remote work accommodation as his disability was intensifying to the point of becoming unsuitable to manage in an in-person office environment.

32. On May 23, 2022, HR Specialist Amber Blount emailed Plaintiff acknowledging his reasonable remote work accommodation request and asked him for further information about his condition.

33. Four days later, Plaintiff responded to Ms. Blount explaining, among other symptoms, that his TSW affected his body's ability to regulate temperature, movement and functionality of his limbs.

34. In response, Ms. Blount issued Plaintiff a TD Medical Accommodation Request Packet to be completed by his healthcare provider.

35. On June 16, 2022, Plaintiff returned the completed TD Medical Accommodation Request Packet.

36. Four days thereafter, Ms. Blount acknowledged that Plaintiff's reasonable accommodation request was primarily to work from home due to his medical condition on a permanent basis and informed him that it would be sent to his manager (Mr. Flaxman) for review and approval.

37. Come April 2023, Plaintiff's symptoms subsided and he returned to work in-person.

38. Around October 2023, Plaintiff's TSW began to flare up again in ways that

impaired his ability to work in-office, and he dutifully informed Mr. Flaxman of this development.

39. Again, Mr. Flaxman agreed to allow Plaintiff to work remotely and did not ask for any additional medical documentation.

40. The following month, Plaintiff began working remotely and stopped coming into the office.

41. No performance issues had yet arisen, and Plaintiff was able to satisfactorily effectuate his job responsibilities without any problems due to his reasonable remote work accommodation.

42. Plaintiff subsequently learned of a treatment clinic near Bangkok, Thailand that specializes in his condition and decided that he wanted to travel there for treatment of his disabling condition.

43. Plaintiff thus informed Mr. Flaxman in February 2024 of his desire to take a protected medical leave for treatment of his disability at the aforementioned clinic.

44. Mr. Flaxman provided his approval of this arrangement.

45. Plaintiff communicated with Mr. Flaxman on coordinating the necessary steps and/or paperwork that need to be handled in the office prior to his trip.

46. Plaintiff further offered to work remote from Thailand until his duties were satisfactorily transferred to other employees.

47. Plaintiff arranged to relocate and timely informed his manager, Mr. Flaxman.

48. On March 13, 2024, Defendant's third-party benefits administrator, The Hartford Group, confirmed receipt of Plaintiff's claim.

49. Plaintiff courteously reminded Mr. Flaxman of his anticipated travel to Thailand in April 2024.

50. In response, Mr. Flaxman expressed surprise despite their discussions of this

planned relocation and subsequent medical leave the preceding month.

51. Mr. Flaxman failed to fulfill his obligations to prepare for Plaintiff's approved leave of absence.

52. That day, Mr. Flaxman advised Plaintiff that he needed to reach out to Defendant's IT department in addition to HR.

53. Plaintiff therefore contacted IT Support Specialist Artem Litvachahkis to explain his anticipated trip and needed to be able to work remotely from Thailand as he had been doing from home.

54. Mr. Litvachahkis requested time to return Plaintiff an answer as he did not know if that technical arrangement was possible.

55. Mr. Flaxman contacted HR advising them of Plaintiff's plans to work from Thailand temporarily to obtain medical treatment.

56. HR responded by emailing Plaintiff paperwork to complete to approve this arrangement, which Plaintiff's treating medical provider in Thailand timely completed and returned.

57. Another HR representative emailed Plaintiff back requesting to know how Plaintiff obtained the paperwork he completed, and informed Plaintiff that the paperwork was invalid and therefore it was impermissible for Plaintiff to work while in Thailand.

58. Plaintiff responded that Defendant's own HR department had sent him the paperwork for approval to work from an outside jurisdiction.

59. Around mid-April 2024, Defendant denied Plaintiff's request to work from an outside jurisdiction, flying in the face of the previously approved arrangement with Mr. Flaxman and greatly harming his emotional health.

60. In an email dated April 17, 2024, Defendant's 3rd party benefits administrator, The

Hartford Group, emailed Plaintiff medical leave forms "to help set up your time away from TD" which he timely completed and submitted the following week.

61. An "Attending Physician Statement" contained in the documents from The Hartford, that Plaintiff's doctor signed around April 23, 2024, and which Plaintiff submitted, recommended that Plaintiff be off work until January 22, 2025 due to his serious medical condition.

62. Plaintiff submitted medical documentation indicating that Plaintiff was under medical restrictions, including but not limited to sitting no more than two (2) hours at a time,

63. On or about August 8, 2024, HR manager Laura Gilpatrick emailed Plaintiff to schedule a phone call about Plaintiff's leave status.

64. On August 20, 2024, Ms. Gilpatrick held a Microsoft Teams call with Plaintiff in which he inquired if he would be allowed to work remotely for Defendant from the states of Florida, Texas, or California as the warm climate in those states is more conducive to managing and treating his disability than that of New York.

65. After the Teams calls, Ms. Gilpatrick emailed Plaintiff her summary of the meeting and proposed next steps, including possible remote work from another state and scheduling a return date for Plaintiff to resume work.

66. On September 19, 2024, Plaintiff emailed Ms. Gilpatrick asking for an update to their August 20th conversation.

67. On September 26, 2024. Plaintiff emailed Ms. Gilpatrick a second time asking for an update to their August 20th conversation in the same email thread as that of his September 19, 2024 communication.

68. On October 1, 2024, Plaintiff emailed Ms. Gilpatrick a third time asking for an update to their August 20th conversation in the same email thread as that of his September 19,

2024 communication.

69. On October 14, 2024—nearly two (2) months after their August 20th conversation—Ms. Gilpatrick emailed Plaintiff in a new email thread:

> I'm just returning from a long PTO break and wanted to circle back with you on your leave claim status. I did receive an update from The Hartford that your Long Term Disability (LTD) claim was denied and wanted to connect with you briefly on next steps. Additionally, I know that when we spoke last, you were asking about potentially working in other locations and working from home exclusively due to your medical condition. As we discussed, we would need you to complete the attached Workplace Accommodation Form and submit to our Workplace Accommodations Team for review. There is a section for your doctor to complete on the form as well.
>
> For me, I would need to understand what your return to work plan is, if you have one, as your STD (short-term disability) claim is approved through 10/20, which is fast approaching, and your FMLA (job protection) claim exhausted as of 7.12.24, so we would need to make decisions on any additional Medical Accommodation Leave for job protection.
>
> Please let me know the best day/time to speak with you and I'm sure we can coordinate a call. My hours are generally Mon-Fri, 8am-5pm. Thanks again and hope to talk with you soon.

70. On October 17, 2024, Plaintiff responded:

> Hi - I'm not sure why it was denied. Last I spoke to Hartford, they approved me until January and said no further action was required on my end. Let me contact them
>
> I am planning to return to work, currently in the process of sorting matters here in Thailand such as finding someone to take over my lease Let's aim for your Friday morning?

71. During Plaintiff's email exchange with Ms. Gilpatrick, she pressured him into returning early to work despite his medical restrictions still being in effect keeping him out on medical leave.

72. Defendant sent Plaintiff additional forms to complete in order for Plaintiff to work remotely from out-of-state.

73. On November 5, Plaintiff emailed Ms. Gilpatrick attempting to schedule a follow-

up meeting after he had submitted the documents to Defendant.

74. In this request, he sent the completed medical accommodation request to work out of state in California, Texas, or Florida, and requested his employee identification number to properly file it with Defendant.

75. On December 12, 2024, Plaintiff followed up on his schedule and accommodation request from November 5, 2024.

76. Around December 23, 2024, Plaintiff attempted to obtain a toll-free phone number that he could utilize to speak with Ms. Gilpatrick from Thailand.

77. Around December 26, 2024, Ms. Gilpatrick responded asking if he was able to use the Microsoft Teams platform to communicate for a possible meeting the following day.

78. Plaintiff and Ms. Gilpatrick did schedule that meeting via Teams for the following day.

79. Around December 27, 2024, during the Teams meeting, Plaintiff reiterated to Ms. Gilpatrick that he wanted to return to work and asked if he would be able to work remotely out of state so that he could continue to allow his TSW to heal.

80. Ms. Gilpatrick provided Plaintiff one week to return.

81. Plaintiff again requested his employee identification number, which Ms. Gilpatrick failed to provide.

82. After finding his employee identification number on an old paystub, Plaintiff resubmitted his medical accommodation request on or about January 1, 2025.

83. On or about January 3, 2025, Defendant terminated Plaintiff's employment effective January 1, 2025.

84. Dumbfounded, Plaintiff replied to that email on or about January 6, 2025, reminding Ms. Gilpatrick of the allotted week to return to work.

85. The following day, Plaintiff asked how this would affect his return, in response to which Ms. Gilpatrick stated she had just learned of Plaintiff's accommodation request dated January 1, 2025.

86. Mr. Flaxman confirmed he was not notified about this termination.

87. But for Plaintiff's disability and Plaintiff's requests for reasonable accommodation, Plaintiff would not have been terminated.

88. Defendant did not want to deal with Plaintiff's future request for reasonable accommodation and medical leave.

89. Defendant did not take steps to discuss with Plaintiff and engage in the interactive process to determine what accommodations he might require.

90. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer emotion pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

91. As a result of the acts and conduct complained of herein, Plaintiff has also suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails.

92. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

## CAUSES OF ACTION

## FIRST CLAIM

**Disability Discrimination and failure to provide reasonable accommodations as required by the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law**

93. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 92 with the same force as though separately alleged herein.

94. The Americans with Disabilities Act requires that employers such as provide a reasonable accommodation to an employee if an employee indicates that they are disabled and require such an accommodation.

95. The New York State and City Human Rights Laws track and expand the Americans with Disabilities Act. Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Americans with Disabilities Act.

96. The New York City Human Rights Law also allows for individual liability.

97. Plaintiff is disabled.

98. Plaintiff made known to Defendant that he was disabled.

99. Plaintiff sought a reasonable accommodation in the form of remote work.

100. Plaintiff was discriminated against based on his disability.

101. As such, Defendant intentionally and willfully violated Plaintiff's right to an accommodation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages as the failure to engage in the interactive process was malicious and inexcusable, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

## SECOND CLAIM

**Termination as a result of disability discrimination in violation of the Americans with**

**Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law**

102. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 92 with the same force as though separately alleged herein.

103. The Americans with Disabilities Act requires that employers such as provide a reasonable accommodation to an employee if that employee indicates that they are disabled and require such an accommodation.

104. The New York State and City Human Rights Laws track and expand the Americans with Disabilities Act. Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Americans with Disabilities Act.

105. The New York City Human Rights Law also allows for individual liability.

106. Plaintiff is disabled.

107. Plaintiff made known to Defendant that he was disabled.

108. Plaintiff was terminated as a result of his disability.

109. As such, Defendant intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages as the failure to engage in the interactive process was malicious and inexcusable, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

## THIRD CLAIM

**Retaliation for complaints of disability discrimination as required by the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law**

110. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 92 with the same force as though separately alleged herein.

111. The Americans with Disabilities Act requires that employers such as provide a reasonable accommodation to an employee if an employee indicates that they are disabled and require such an accommodation. Failure to do so, or inequitable treatment as a result of such an accommodation, is discrimination.

112. The Americans with Disability Act also states that an employee who raises a good faith complaint of discrimination, such as Plaintiff had, is protected from retaliation.

113. The New York State and City Human Rights Laws track and expand the Americans with Disabilities Act. Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Americans with Disabilities Act.

114. The New York City Human Rights Law also allows for individual liability.

115. Plaintiff is disabled.

116. Plaintiff made known to Defendant that he was disabled.

117. Plaintiff was denied accommodations.

118. Plaintiff complained about being denied accommodations.

119. Defendant terminated Plaintiff because he complained about disability discrimination.

120. As such, Defendant intentionally and willfully violated Plaintiff's right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages as the failure to engage in the interactive process was malicious and inexcusable, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

B. For the second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

C. For the third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements; and

D. For such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 17, 2026

**HARMAN GREEN**

By: ______________________

Walker G. Harman, Jr., Esq.
**HARMAN GREEN**
99 Hudson, Fifth Floor
New York, New York 10013
824 Exposition Ave., Suite 8
Dallas, Texas 75226
(646) 248-2288
wharman@harmangreen.com
erichardson@harmangreen.com
*Attorneys for Plaintiff*